UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | No. 14-cr-175-01-RJA |
| | ) | |
| LISA MILLER, | ) | |
|     Defendant. | ) | |

GOVERNMENT'S OPPOSITION TO MOTION FOR RELEASE

Defendant Lisa Miller was arrested in January 2021 when she returned to the United States after being a fugitive for over a decade. The government moved for detention based on the obvious risk of flight. Miller consented to detention. She now presents proposed conditions of release suggesting that she will not abscond again. In light of the circumstances, these proposed conditions are not sufficient to "reasonably assure the appearance of the person as required." 18 U.S.C. § 3142(e). In essence, the Court is offered nothing more than Miller's word, which should be insufficient.

Section 3142(g) sets forth the factors the Court should consider in making this assessment. The factors related to risk of flight support detention. The government is not seeking detention based on safety of the community, and thus the factors related to dangerousness are largely irrelevant.

To begin with, the charged offense is a serious one, involving a minor victim. 18 U.S.C. § 3142(g)(1). Lisa Miller is charged with kidnapping a seven-year-old child out of the United States to grow up hiding in Nicaragua. Miller prevented the child from experiencing childhood in one of the most developed countries in the world, forcing her to grow up without American schools and the American way of life. Prior to the kidnapping, Miller was raising her daughter in

1

Virginia. While committing the charged offenses, Miller became a member of the Mennonite faith, a path she and the child have taken because the Mennonites hid and sheltered her for over a decade.

Miller is facing additional jail time. She has been in custody for less than a year. Her co-defendants who went to trial received sentences of 36 month (Zodhiates) and 27 months (Ken Miller). Miller highlights the challenges she faces in custody. The Court has only her word that she will not abscond to avoid additional jail time.

The evidence against Miller is overwhelming. 18 U.S.C. § 3142(g)(2). To begin with, Miller's co-defendants have been convicted, two by jury trials. It now appears that Miller's only hope is an affirmative defense, fleeing domestic violence, which none of the co-conspirators raised at trial. The evidence proffered by the defense fails to show that Lisa Miller fled domestic violence. The parties will likely disagree about the scope of the defense. The defense appears to take the position that it only need show that Miller had a reasonable belief that the child was physically abused by the other parent. The government, on the other hand, will take the position that the defense requires Miller to show by a preponderance that the child was in fact abused and that Miller kidnapped the child because of that abuse. The evidence cited so far by the defense does not make out even their limited claim. They rely on observations about the child's behavior after visits with the Vermont mother, Janet Jenkins. Miller has offered no evidence to rebut the common sense conclusion that these behavior issues are entirely consistent with a child involved in a contentious custody battle. The behaviors, even if true, do not prove that Jenkins committed abuse.

Moreover, there is abundant proof undercutting the conclusion that Lisa Miller left the country and kept the child outside the country for over a decade because of Jenkins's physical

2

abuse. These behavior issues were raised during the custody battle. First, in late 2007, one of Miller's friends made a referral to the Virginia Department of Social Services raising an abuse concern from the child's behavior. The matter was investigated and found unfounded. Second, Miller presented evidence about the behavior issues to the Vermont custody judge in early 2009. He too rejected the conclusion that the behavior issues proved that Jenkins was acting inappropriately, let alone physically abusing her daughter. Third, the child was represented by counsel in 2009. The child's lawyer took an active role in the custody litigation in 2009, meeting with the child as well as both parents. The child's attorney never took the position that Jenkins was abusing the child.

Miller made clear over and over again that she did not want Jenkins to have contact with the child because of Jenkins's lesbian lifestyle. Miller kidnapped her daughter just before a court-ordered visit, while a motion to transfer custody was pending. The motion to transfer was based on Miller's repeated avoidance of allowing court-ordered visits. The Vermont judge was obviously giving Miller one last chance to allow a visit. Miller declined to appear at the August 2009 hearing on the motion. She offered no evidence about a fear of physical abuse from visits. Instead, she filed an affidavit about her current position on custody. Miller did not point to physical abuse as a reason that she was resisting the Vermont visitation orders. Ex. 1. Miller resisted abiding by the law because of the impact on the child of having "a continuing relationship with a woman who claimed to be her second mother and continued to live the homosexual lifestyle. . . . The Bible is clear that God designed marriage to be between one man and one woman. There is no concept of a child having two mothers in God's plan for family and marriage." Ex. 1 at 2. After Miller kidnapped her daughter she wrote a post for her supporters in December 2009 announcing that she was following what she believed to be God's direction;

3

again she did not mention domestic abuse. Ex. 2. One of Miller's custody lawyers, Rena Lindevaldsen, published "Only One Mommy: The Lisa Miller Story" in 2011 based on help Lisa provided prior to the kidnapping. Miller's story focuses on the author's and Miller's religious beliefs about homosexuality, not allegations that Jenkins was physically abusing her daughter. In short, the proposed defense faces serious obstacles.

Further, the affirmative defense is especially weak with regard to Count Two, the substantive kidnapping charge. To establish the defense for that count Miller would have to prove that she left the United States in September 2009 and obstructed the court-ordered visit for the next weekend because Jenkins would commit abuse during that court-ordered visit. The visit was planned to take place in the presence of the Jenkins's Virginia-based parents. Miller has pointed to no evidence suggesting that she reasonably believed that Jenkins would abuse the child in her grandparents' presence during that weekend.

Miller's history and characteristics also weigh heavily in favor of detention. 18 U.S.C. § 3142(g)(3). To begin with, Miller has few if any substantial connections to the United States at this point. She has lived outside the country for over eleven years. While her daughter, now an adult, has moved back to Virginia, she too has few contacts in the United States. Miller has little reason to stay in the United States to face additional jail time.

The defense proposes that Miller reside with a couple, who have never met her. This residence provides no protection from Miller absconding. Even if the Shanks' word is to be trusted, Lisa would have abundant opportunities to leave their residence. A report by the Shanks that Miller had left would give scant protection from Miller being guided out of the country again or into hiding.

The past decade has shown that unknown people in the Mennonite community have been assisting and guiding Miller. The Court has no information about these individuals or their motives. Indeed, Miller has not offered an explanation for her return to the United States. To be sure, she voluntarily returned, but that return alone should not provide assurance that Miller and her Mennonite leaders will not decide that she should leave the country again, particularly if the Court's rulings make her defense less viable. Miller did not surrender when her daughter turned eighteen in April 2020. Instead, she waited until President Biden was inaugurated.

The Court has no basis to trust these unknown Mennonite leaders. When one of the co-conspirators, Ken Miller, a Mennonite pastor from Virginia who guided Lisa Miller to contacts in Nicaragua in 2009, was ordered by this Court to provide testimony in Philip Zodhiates's trial, he contemptuously refused the obey the Court's order to testify. He told the Court that he had to obey God's instructions, not the Court's. Lisa Miller believes in the same divine guidance. The Court cannot be assured that Miller will not hear a new divine call to disobey her legal obligations.

Miller herself has an extensive history of disobeying court orders, beyond being a fugitive for years. Prior the kidnapping, Miller was found in contempt eight times by the Vermont court and twice by Virginia courts. This case is about Miller's unwillingness to follow the law if it conflicts with her strongly held beliefs.

Finally, Miller points to her health concerns as a reason for release. To begin with, these concerns should not significantly impact the Court's assessment of Miller's assurances of abiding by this Court's orders. To the extent that Miller needs additional services in custody, they should be provided. Release should not be the first remedy for insufficient medical care. As a first step, the Court should receive information from the detention facility explaining that they

cannot satisfy Miller's medical needs. The Court and the Marshals Service could also explore other facilities to address any unserved medical needs.

Moreover, the Court has received no medical evidence about Miller's alleged concerns. The need for medical information is particularly crucial in order to assess Miller's claim that continued detention would make her incompetent to stand trial. That claim should face rigorous testing before being accepted by the Court.

This incompetence claim also clashes with Miller's own letters to her followers from jail. Miller has a fund-raising web site for which she regularly posts information about her experience in jail and her requests for prayers. This correspondence does not support Miller's current claim of serious medical issues. Indeed, Miller submitted a letter to the website less than a month ago in which she described her jail life as normal and explaining her studies:

> Many of you have expressed a desire to know more about my daily life in jail. It's really quite normal. I try to keep to a schedule as much as possible. Monday through Friday mornings typically find me folding, sorting and organizing the jail's uniforms, linens and shoes. On Wed. and Sat. we have linen exchange, and for last Sat's exchange I made 208 setups (1 sheet, 1 pillowcase, 1 towel, 1 washcloth rolled up in another sheet) and 12 bedrolls (roll the sheets, towel and washcloth in a blanket and place the roll in a pillowcase. The Wed. count varies from 100-125 and is for completely different units.
>
> After lunch if need be I return to laundry, otherwise, I write letters. After "lock-in" for shift change (2:30 pm - 3:15 pm), I keep occupied with talking to the girls, making phone calls, reading and or writing letters until around 6:00 pm when I usually put away my writing implements to stretch out on my bunk (bed) with a good read. You all have blessed me tremendously in keeping my eyegate pure. I read typed sermons, magazines (thank you to the "anonymous to me" sender of Bliss Victoria), and books. The girls say I sure do read a lot of different types of books. =) they also teasingly claim I have 7 Bibles in my room when in reality I have two, one English and one Spanish. Currently, I am reading Under God's Arrest, (Ida B. Bontrager), and a biographical book on a "wrenching personal expression… to clear his head [author's] of madness and alcohol". For personal study, I'm reading From the Garden to the City, The Redeeming and Corrupting Power of Technology (John Dyer), a thin book espousing a Biblical viewpoint to the heavily research-based application to technology and which is a complement to The Shallows: What the Internet is Doing to our Brains (Nicholas Carr), which I just finished reading and reviewing line upon line, again and again.

> For Bible Study (with others) I'm reading Lies Woman Believe (Nancy DeMoss Wolgemuth). Also I am perusing <u>The New Testament Documents</u> (F.F. Bruce) in order to help me "to be ready to give an answer" during the expository cell block Study of the Gospel of John. These Bible Studies (3 times/week) are the highlight of my week.
>
> For personal devotions I am reading <u>The Kingdom of the Cults</u> (Walter Martin), a formidable dissertation of various cults we may encounter; <u>Correcting the Cults: Expert Responses to their Scripture Twisting</u> (Norman L. Geisler & Ron Rhodes), a verse-by-verse "Q&A" enlisting the majority books of the Bible ; and <u>Gripped by a Dark Hand</u> (Paul Weaver), a book detailing the varying occult and witchcraft practices prevalent today. When I'm done with <u>Gripped…</u>, I will read <u>How to Protect Your Child from the New Age and Spiritual Deception</u> (Berit Kjos), a book detailing how "media" is saturated with spiritualism. Remember "media" includes printed materials. Spiritualism and/or an eclectic religious view seems to be prevalent in today's society. Consequently, I want to study it in depth so I can better "give an answer" for my hope which I find in Jesus.

Ex. 3. Miller's course of study undercuts her claim that her medical concerns prevent her from cognition and concentration.

Finally, the treatment Miller is receiving in custody must be at least as robust as that she received in Nicaragua. Miller has no medical insurance and no job. She would have to apply for Medicaid. There is no evidence that her treatment in custody is worse than she would receive on Medicaid. To the extent that Miller needs additional medical attention, the Marshals' service should be ordered to provide that service rather than releasing a defendant with a high risk of flight.

For the forgoing reasons, the Court should deny Miller's motion for pretrial release.

Dated at Burlington, in the District of Vermont, on October 19, 2021.

Respectfully submitted,

UNITED STATES OF AMERICA

Trini Ross
United States Attorney

*/s/ Paul J. Van de Graaf*
Paul J. Van de Graaf
Special Assistant U.S. Attorney
P.O. Box 570
Burlington, VT  05402
Phone: (802) 951-6725

Michael DiGiacomo
Assistant U.S. Attorney