# Exhibit 1

STATE OF VERMONT
RUTLAND COUNTY, SS.

RUTLAND FAMILY COURT
DOCKET NO. 454-11-03 Rddm

LISA MILLER,                    )
                               )
              Plaintiff,        )
                               )
       v.                      )
                               )
JANET JENKINS,                  )
                               )
              Defendant.        )

## AFFIDAVIT OF LISA MILLER IN OPPOSITION TO DEFENDANT'S MOTION TO MODIFY PARENTAL RIGHTS AND RESPONSIBILITIES

I, LISA MILLER, a resident in Bedford, County, in the Commonwealth of Virginia, being duly sworn, hereby state the following in opposition to Defendant's Motion to Modify Parental Rights and Responsibilities: ·

Introduction

1.    At a time when the Court is entertaining a motion by Janet to give her primary custody of my biological child, I beg this Court to consider the ramifications of this case. When this case began in December 2003, I was the mother of a beautiful twenty-month old girl and had just a few months earlier left an unhealthy and destructive relationship and lifestyle. During the several months of bed rest during my pregnancy, I had a lot of time to contemplate my life choices, including my *choice* to life in the homosexual lifestyle for nine years. Looking back, I know that during the pregnancy God was prodding me to return to the truths of Scripture I had learned as a child.

Miller Affidavit in Opposition - Page 1

000400
000400

Unfortunately, I spent the year following my child's birth avoiding what I knew was right; instead, I tried moving to Vermont with Janet, in the hopes that a change of environment would cover up the underlying problems in our relationship and in my life. After a year in Vermont, however, when Isabella was just seventeen months old, I finally did what I knew I had to do, leaving the homosexual lifestyle and ending my relationship with Janet.

2.      When I filed this suit to dissolve my civil union, I naively believed (i) Janet when she said she told me she knew Isabella was my child and that she would not fight me for custody, (ii) I could occasionally let Janet visit with Isabella (supervised) without harm to my rights as Isabella's only parent, and (iii) this case was only about me officially ending my relationship with Janet and my involvement in homosexuality. I received a rude awakening in January 2004 when Janet counterclaimed for custody of my child, claiming she was a parent. I quickly realized that this case was not just about two women going their separate ways but about a battle in this nation to redefine marriage, parentage, and family. Janet sought to change Vermont law so as to declare her a parent even though she had chosen not to adopt Isabella and was not her biological mom.

3.      In addition, as I became stronger in my faith, and learning "on the job" as a first time parent, it also became clear that I was mistaken about the impact it would have on Isabella if she had a continuing relationship with a woman who claimed to be her second mother and continued to live in the homosexual lifestyle. This case was thus not only about changing parentage law in Vermont but was also about having Vermont courts choose between two diametrically opposed worldviews on parentage and family. The Bible is clear that God designed marriage to be between one man and one woman. There is no concept of a child having two mothers in God's plan for family and marriage. On the other hand, as reflected in the book Janet read to Isabella during one visitation,

000401

000401

"Heather Has Two Mommies," the other worldview believes that a child can have two mothers or two fathers. There are even those who believe that a child can have three or four parents. As the past five years have demonstrated, this case is about so much more than the three people immediately involved. But, as Isabella's biological mother, I urge this Court to remember that what is at stake is the health and well-being of an intelligent, delightful, beautiful, seven year old Christian girl. As set forth below, it is not in Isabella's best interest to switch custody to Janet.

4.      Before I lay out the reasons why I oppose Janet's request for custody of Isabella, I need to remind the Court that I openly lived in the homosexual lifestyle for nine years. During that time, I was involved in homosexual advocacy organizations and was surrounded by others who lived the homosexual lifestyle. I know first-hand the life choices that accompany those who are living the homosexual lifestyle. I know firsthand from living in that community that it is not an appropriate environment in which to raise a child. Because of events during my childhood, I also know first hand how important the home environment is to the well-being of a child.

5.      I was raised in an abusive home and, as a result, lacked the self-esteem I needed to form healthy relationships. Following that childhood, I entered a marriage relationship with a man at a young age, which became unhealthy and emotionally abusive. It was the end of that relationship, coupled with the death of my mother, that caused me to consider other options for my life. Unfortunately, I had a counselor suggest that a lifestyle change might be the answer to my problems: perhaps a relationship with a woman would be better for me. To my detriment, I took that advice and a few years later found myself in an unhealthy relationship with Janet, whom I had met at an AA meeting. As I look back, it isn't surprising that I went from an unhealthy relationship with a man to a similarly unhealthy relationship with a woman – I had not dealt with the underlying issues that

Miller Affidavit in Opposition - Page 3

000402

000402

cause someone to seek out unhealthy relationships. That is how my relationship with Janet began. During our time together, she was physically and emotionally abusive, we abused pornography, and she had mental stability issues. None of this is surprising when you read the findings below concerning pathology among homosexuals, of which I have made myself aware.

6.     What I want to stress is that the life circumstances that I found myself in during the late 1990s with Janet were directly attributable to the abuse and conditions of my childhood. As I mentioned above, the change of direction in my life began as I was pregnant with Isabella. During that pregnancy, as I was bedridden, I was reminded of another part of my childhood – the one where I had been regularly involved in a church (as a means to escape from home) and heard truths of Scripture. Although I had ignored those teachings for several years, they came back to me during the pregnancy. Because of those seeds planted in my years earlier, I eventually realized that I was living a life that was not pleasing to God and in an environment that was not good for my child. I say this to point out that I know first hand how positive and negative experiences as a child have lasting impact. I also know first hand that I was able to become freed from the grip that my childhood abuse had on me only through the Christian faith.

7.     Placing Isabella in the home of someone committed to living a homosexual lifestyle is not in Isabella's best interest. Janet cannot provide a suitable home environment for Isabella, she has repeatedly failed to demonstrate a sincere interest in Isabella, she has overtly demonstrated hostility toward Isabella's Christian faith, and Janet is living a lifestyle that is not only harmful and unhealthy, but one that Isabella knows is wrong.

**Placing Isabella in the Home of a Woman Who Has Repeatedly Failed to Demonstrate a Sincere Interest in Isabella Is Not in Isabella's Best Interest.**

000403

**000403**

8.     Other than pursuing this litigation, Janet has not demonstrated a sincere interest in Isabella. As I have mentioned to this Court before, Janet has not made efforts to communicate with Isabella by phone, Skype, e-mail, or mail even though I made concerted efforts to help Janet establish phone, e-mail, and Skype communication. Just as she showed no real desire in being a mother when I explored adopting a child in 2000-2001, when I became pregnant with Isabella, or when my relationship with Janet ended, she has not shown any real interest in being a "parent" or establishing a relationship with Isabella, other than pursuing this litigation.

9.     While a parent would go out of her way to attend special events of her child, Janet has demonstrated no such interest. In 2007, Isabella had a lead role in her church's Christmas production. Even though Isabella personally invited Janet to the performance by handing her a flyer for the play, Janet refused and instead characterized it as in inappropriate attempt to advance our religious beliefs on Janet. Isabella and I both invited Janet to attend the 2008 Christmas production where Isabella had a featured part at the birth of baby Jesus. Again, Janet failed to attend. Perhaps even more telling concerning her lack of understanding what it takes to be a parent is her refusal to even accept a plate of cookies that Isabella had baked for her and brought to one of the visits. Janet later explained that she did not accept the cookies because she does not eat sweets. Regardless of whether that is true, anyone who knows children would know that it would have gone a long way in building a relationship with Isabella to have kindly accepted the cookies, even if she later gave them away or let Isabella eat them during the visitation. Instead, Isabella discovered them at the end of the visitation smashed at the bottom of her suitcase, underneath a large pumpkin.

10.    This sort of callousness toward Isabella's feelings was attested to in a June 2007 affidavit of a third party who supervised the May 2007 visitation between Janet and Isabella. During

Miller Affidavit in Opposition - Page 5

that visit, Janet insisted that Isabella hug Janet even though Isabella stated that she did not want to. Even though Janet initially asked Isabella for permission to hug her, when Isabella refused, Janet hugged her anyway. Forcing a child to hug you does not foster the formation of a positive relationship. Of course, it does not foster a good relationship to force the child to bathe naked with you or to watch you go to the bathroom, or to lose her at a county fair, either. Instead, Janet has used bullying and scare tactics to attempt to build a relationship with Isabella. During visits with Isabella, Janet would tell Isabella that eventually Isabella would be living with her. She also repeatedly insisted during visitations that Isabella call Janet "mommy" even when Isabella did not want to.

11.     While Janet claims to love Isabella and that she can provide a good home environment for her, she has shown no sincere interest in Isabella's life. Isabella seems to be nothing more to Janet than a tool, or a trophy.

**Placing Isabella in the Home of a Woman Who Has Demonstrated Hostility to the Sincerely Held Religious Beliefs of Isabella and Lisa is Not in Isabella's Best Interest.**

12.     As I mentioned earlier in this affidavit, this case involves core worldview and religious implications. In particular, every decision this Court makes concerning custody of Isabella – and in particular a decision to give primary custody to Janet – has serious ramifications for the religious beliefs of both me and Isabella. As a seven year old child, Isabella has already made a personal decision to accept the free gift of eternal salvation offered through Christ's sacrificial death and resurrection to pay the penalty for our sins. The decision to follow the truth of Scripture is a personal decision that both Isabella and I have made. She reads the Bible every day and has made a personal commitment to live her life according to the Bible. She knows from her own reading of the Bible that marriage is between a man and a woman, that she cannot have two mommies, that

000405

000405

when I lived the homosexual lifestyle I sinned against God, and that unless Janet accepts Christ as her personal savior, she will not go to heaven. Isabella does not just believe these things because I have told her, as has been suggested in court and in the media concerning this litigation, but she has read the Bible herself and prays for God to help her understand the court battle that is taking place.

13.     Although Janet has often stated in court and in court documents that she would foster a good relationship with me and Isabella if she had custody and that she would respect our religious beliefs, her conduct and court filings undermine that position. During visitation, for example, Janet read "Heather Has Two Mommies" to Isabella, which directly contradicts the truth about marriage and family that is contained in the Bible that Isabella has read. Janet read that book to Isabella, renaming the two mommies in the book to "Lisa and Janet," even though she has represented that she does not talk about the homosexual lifestyle to Isabella.

14.     The very existence of this litigation demonstrates the worldview and religious conflict — Janet thinks a child can have two mothers and that she is a mother simply because she says she wanted me to give birth to Isabella. The book "Heather Has Two Mommies" specifically states that it "does not matter how many mommies or daddies" a child has, that "every family is special," and that the "most important thing is that everyone loves each other." That is not consistent with the truth in the Bible. In Genesis chapter 1, the Bible explains that on the sixth day of creation, God created man and woman in God's image, "male and female he created them." Genesis 1:26-27. He told them to "Be fruitful and multiply" in Genesis 1:28. In the New Testament, Jesus quotes these verses when he talks about marriage. *See* Matthew 19:4-6. The Bible is also clear that homosexuality is a sin. In the book of Romans, chapter 1, Paul explains the sinful conduct people engage in when they turn away from God. "Therefore God gave them over in the sinful desires of their hearts to sexual

000406

000406

impurity for the degrading of their bodies with one another. They exchanged the truth of God for a lie, and worshiped and served created things rather than the Creator – who is forever praised. Amen. Because of this, God gave them over to shameful lusts. Even their women exchanged natural relations for unnatural ones. In the same way the men also abandoned natural relations with women and were inflamed with lust for one another. Men committed indecent acts with other men, and received in themselves the due penalty for their perversion." Romans 1:24-27. It is clear from Janet's ongoing statements and litigation that she holds diametrically opposed views about marriage and family and therefore could not affirm the Biblical truths that Isabella and I follow.

15.     Janet has even gone so far as to suggest in court papers that I do not have Isabella's best interest in mind because of my belief that God has a plan for Isabella's life, and that I believe God formed Isabella in the womb and knew her even before she was formed in the womb. If Janet is suggesting that believing in God as the creator of all life is somehow contrary to Isabella's best interest, then Janet denies core tenets of the Christian faith.

16.     Even more to the point is that it is simply disingenuous for Janet to suggest that she will not undermine Isabella's Christian faith. Janet is living a homosexual lifestyle, which the Bible states plainly is a sinful lifestyle. *See, e.g.,* Leviticus 18:22. Isabella knows this and cannot be expected to abdicate her faith because of a legal fiction that she somehow has two mothers. As any parent knows, a child learns more from what we do than what we say. Janet's lifestyle is in direct conflict with the truth of Scripture. By choosing to live a life contrary to Scripture, she would be modeling for Isabella that it is acceptable to disobey God, when in fact it is not. Janet has further heightened the conflict by reading such books as "Heather Has Two Mommies" to Isabella. Janet's papers accuse me of "setting a poor example" by not complying with visitation orders that treat Janet

000407

000407

as a parent to Isabella. If that is true, how much worse is the long-term earthly and eternal impact on Isabella of Janet setting the poor example of daily living a life in rebellion to God.

**It Is Not in Isabella's Best Interests to Give Janet Primary Custody Because Janet Cannot Provide a Suitable Home Environment for Isabella.**

17.     Several of the statutory best interest factors indicate that it is not in Isabella's best interest to switch primary custody to Janet. Specifically, Janet cannot provide the love, affection, and guidance Isabella needs, cannot provide for Isabella's (spiritual) development needs, would not foster a positive relationship between Isabella and me, does not have, and cannot develop, a positive relationship with Isabella, and cannot communicate and cooperate with me in decision-making (since she has adamantly refused to have any communication whatsoever with me). In addition, Isabella would have a difficult adjustment into the Vermont school system and community.

18.     As I mentioned earlier, Isabella is a Christian. She has made a commitment to follow the teachings of the Bible. As Christians, nothing is more important than our personal relationships with Jesus Christ and our commitment to live by Scriptural truths. Janet, who is living a life in direct conflict with the teachings of the Bible, who has not accepted Christ as her Lord and Savior, and who has alleged in court papers that I am a bad parent because I believe that nothing is more important than following the truth of Scripture, cannot possibly provide guidance to Isabella in this most important area of her life. In fact, if anything, Janet would provide improper guidance that seeks to undermine Isabella's faith by, for example, taking her to a church that teaches false doctrine, telling Isabella that the Bible is not true, and mocking Isabella's beliefs. Janet has demonstrated this by her prior actions. She has adamantly refused to attend Isabella's church play, instead telling me, through her attorneys, that she wanted Isabella and me to stop forcing our religion on her. She has made fun

Miller Affidavit in Opposition - Page 9

of Isabella's clothing because Isabella dresses too modestly. In particular, she has made fun of the fact that Isabella likes to wear dresses and that when she does wear a dress its length is at or just below the knee. Janet has also directly contradicted the Bible to Isabella, telling her that she can have two mothers. Clearly, Janet is incapable of providing her with essential spiritual guidance.

19.    Related to this, she cannot provide her essential, proper guidance on key issues in life. For someone who rejects the teachings of the Bible about marriage and family, it seems likely she would also reject the teachings from the Bible about sexual morality. In fact, Janet's lifestyle is in direct conflict with proper sexual mores. The Bible is clear that sexual relations should only take place within the context of a marriage relationship between a man and a woman. Clearly, Isabella would be raised in an environment that challenges proper sexual attitudes and mores and would encourage her, by example if not by word, to engage in improper sexual activity.

20.    Because Janet has also repeatedly lied to Isabella, Isabella distrusts her. Janet does not realize how impressionable young children are and how hard it is to gain their trust. For example, when she told Isabella she could not accept the cookies Isabella baked because she does not eat sweets, Isabella later told me that Janet lied to her because she later saw her eat sweets. During my relationship with Janet, I learned that Janet is a habitual liar. Without me ever saying a thing, Isabella has learned that as well from her personal experiences with Janet.

21.    Janet also cannot meet the developmental needs of Isabella. Just as I was an abused child and made poor choices because of it, until I turned my life around through my Christian faith, Janet was abused and acts consistently with an abuse victim. She is controlling, obsessive, deceitful, abusive, and poor tempered. Because she has never worked through the abuse, she will continue the pattern of abuse with those around her. As this Court is aware, she was abusive with me, both

000409

000409

verbally and physically (even shoving me while Isabella was in my arms as a baby). She also fraudulently signed my name in connection with government documents, refused to let me leave the house without her when we were in a relationship together (except to attend AA meetings, which I only did a couple of times because Isabella would scream when I left her with Janet and continued to scream until I returned), and openly viewed pornography in Isabella's presence while we were together, over my objections. I understand that Kate Mooney, one of Janet's same-sex partners after my relationship with Janet ended, has been prepared to testify before this Court to similar conduct during her relationship with Janet. In fact, Kate Mooney even filed criminal charges against Janet. If Isabella is in Janet's home, she will not receive the proper love, affection, and guidance she needs as she approaches her "tween" and teen years.

22.     Isabella would also face an extremely difficult transition to a new school and state. Isabella knows right from wrong. She also knows who her mother is. Forcing her to live in a far-away state and attend a school where the homosexual lifestyle is fully accepted will make for an incredibly difficult transition. In addition, Isabella's personal life will be no secret to those in her new school. A quick google search reveals a lot about her life. Taking her out of a Christian environment and placing her in an environment that is critical of her biological mother and her religious faith will not foster a good emotional transition.

23.     Also important is the fact that Janet cannot communicate with me. I have made repeated efforts over the years since the commencement of this litigation to rationally talk with Janet about this case, about visitation, and about phone/e-mail/skype contact. She has refused to even speak with me. Even when I would drop Isabella off for visitation, she would refuse to talk with me. Instead, she would insist that Isabella act as the intermediary even though she was standing a few

Miller Affidavit in Opposition - Page 11

feet away. She refused to let me drop Isabella off at Janet's home, insisting that I drop my daughter

off at a park. When I would drop Isabella off at Janet's parents, I was not allowed in the house there

either. The exchange would take place in the drive way. Janet is simply incapable of civil, rational

discourse with me. Nor has she allowed Isabella to communicate with me during visitation. Even

though I provided Isabella with a cell phone for visitations, calls still did not take place. Instead, each

time the phone would come back broken, not working, or stuffed in a bag with a wet clothing. If I

called Janet's cell phone during the visit, because I could not reach Isabella on her cell phone, to see

how Isabella was doing, Janet would lie and tell Isabella that I never called or tell me to call back

some other time because they were eating.

24.     Janet's actions make clear that the visitation issues will not be resolved by switching

custody to Janet. Rather, if custody is switched to Janet, this Court will then be dealing with a

situation where Janet refuses to allow me, as Isabella's biological child, to properly communicate

or visit with my child.

### Placing Isabella in the Home of An Active Homosexual is Not in Her Best Interest

25.     It is not in Isabella's best interest to place her in the home of a woman who is actively

involved in an unhealthy lifestyle. It is well documented that those engaged in the homosexual

lifestyle have much greater incidence of substance abuse, mental health problems, medical illness,

and relationship dysfunctions. Even articles written in homosexual publications attest to this fact.

Documenting these facts, a recently published, peer-reviewed journal dedicates twenty-five pages

summarizing prior literature and studies in this area. It concludes that "it is difficult to find another

group in society with such high risks for experiencing such a wide range of medical, psychological,

and relational dysfunctions." 1 J. of Human Sexuality 1:53 (2009) (hereinafter, the "Journal")

Miller Affidavit in Opposition - Page 12

000411

000411

(attached as Exhibit A). A recent study prepared by the Massachusetts Department of Public Health confirms these findings (attached as Exhibit B).

26.     Although a copy of the Journal is enclosed with this affidavit for the court to read in more detail, I will summarize here some of the relevant findings, all of which are not surprising to me from what I saw and experienced during my nine years in the homosexual lifestyle and homosexual community:

a.     "The homosexual and bisexual groups reported significantly poorer mental health in terms of anxiety, depression, suicidality, and negative affect than the heterosexual group." Journal at 1:55.

b.     "Homosexual women demonstrated 2.05 times increased risk of lifetime prevalence of depression compared to heterosexuals." Journal at 1:57.

c.     "Homosexual women demonstrated 1.82 times increased risk of lifetime prevalence of suicidal attempts compared to heterosexuals." *Id.*

d.     "Homosexual women demonstrated 4.00 times increased risk of 12-month prevalence of alcohol dependence compared to heterosexuals." *Id.*

e.     "Homosexual women demonstrated 3.50 times increased risk of 12-month prevalence of drug dependence compared to heterosexuals." *Id.*

f.     "Homosexual women demonstrated 3.42 times increase risk of 12-month prevalence of any substance use disorder compared to heterosexuals." *Id.*

g.     "30.3 percent of homosexually active women were 'very high or drunk 3 or more days' in the past year compared to 16.6 percent of heterosexual women." Journal at 1:58.

Miller Affidavit in Opposition - Page 13

h.  "8.4 percent of homosexually active women were 'very high or drunk an average of once per week or more' in the past year compared to 2.3 percent of heterosexual women." *Id.*

i.  "Overall, 41.8 percent of lesbians and 45.6 percent of bisexuals reported they were heavy alcohol drinkers, compared with 12.7 percent of heterosexuals. Alcoholism among homosexual women is evidently so problematic that even with a support system such as Alcoholics Anonymous (AA), they do not respond as well to counseling as their heterosexual counterparts." *Id.*

j.  A 2005 national telephone survey "found that compared with exclusively heterosexual women, the odds of THC use – marijuana, hash, THC, or 'grass' – was 4.70 (odds ratio) for homosexual women and 6.09 for bisexual women." In fact, "[i]n most studies, substance abuse is higher among homosexual than heterosexual men, and even higher among homosexual women than among both homosexual men and heterosexual women." *Id.* at 1:59.

k.  A 1995 study showed that "17 percent of homosexual women were HIV positive compared with 11 percent of exclusively heterosexual women . . . ." *Id.* at 1:65.

l.  A 1993 study of homosexual women found that "[o]ver 10% of the women surveyed were injection drug users, and of this group, 71% have shared needles. It also appears that lesbians and bisexual women were much more likely to have sex and share needles with gay or bisexual men than

Miller Affidavit in Opposition - Page 14

000413

000413

heterosexual women." *Id.* at 1:66.

m.   Contrary to popular ideas about the health risks among homosexual women, there are increased risks for sexually transmitted diseases and other health risks, including a 2.45 times higher risk of bacterial vaginosis, and increased risk for herpes, gonorrhea, and syphilis. *Id.* at 1:68.

n.   There are also increased mental health concerns. for example, "[l]ifetime suicide contemplation" statistics show that "23.3 percent of homosexual women showed a lifetime risk for contemplating suicide vs. 2.3 percent of heterosexual women." *Id.* at 1:69.

o.   A 2008 study found among Massachusetts residents: "Sexual orientation differences exist with respect to access to health care, overall health status, cancer screening, chronic health conditions, mental health, substance use including tobacco smoking, sexual health, and violence victimization. While gay/lesbian/homosexual adults evidenced poorer health and greater risk than straight/heterosexuals across several health domains, poorer health was observed most often for bisexuals." *Id.* at 1:78.

p.   Similarly, a 2003 study found that "two thirds of homosexual and bisexual adults in the United Kingdom are likely to have mental health problems compared to one third of heterosexuals." *Id.* at 1:78.

q.   Relationship stability is also an issue for those involved in the homosexual lifestyle. One study found that "In all cases, when we dichotomize our sample, the group of people with same-gender partners (or who define

Miller Affidavit in Opposition - Page 15

000414

000414

themselves as homosexual or bisexual) have higher average numbers of partners than the rest of the sexually active people in the sample." *Id.* at 1:83.

r.　　Related to that is the issue of sex addiction or violence in relationships. "Homosexual men and women report experiencing sexual addiction and are reported as being the victims and/or perpetrators of sexual molestation, rape, and other predation at rates much higher than their heterosexual counterparts." *Id.*

s.　　"Studies show that homosexual women are generally more violent and criminal than heterosexual women." *Id.* at 1:85.

**Granting Janet's Order to Give Her Primary Custody of Isabella Would Violate Lisa's Fundamental Rights as Isabella's Biological Mother.**

27.　　I realize this Court, and the Vermont Supreme Court, have heard me argue before that it would violate my parental rights to either declare Janet a de facto parent to Isabella or to grant Janet visitation. I beg this Court to consider the even more serious constitutional implications of actually taking Isabella away from her biological parent. As a result of five years of litigation, I have done a lot of research and become quite familiar with other cases in this country involving custody disputes between former same-sex partners. If this Court were to switch custody to Janet, it would be the first such decision in the country. Even cases where the court declares the former partner to be a *de facto* parent, often the court points out that there is still a presumption that a child should remain with the biological parent.

28.　　I am a good parent. I believe that is evidenced by the fact that during all the years of litigation, Janet has never sought to switch custody on the grounds that I am an unfit parent. Granted,

000415

000415

she came close to alleging that with her set of interrogatories concerning my religious beliefs, but even she had to know that our country has not digressed so far as to take custody of a child away from her biological mother because the mother is a Christian. While we have come a long way in this country from its Christian roots, we thankfully have not yet reached the point where a parent's Christian beliefs make her *per se*, or even presumptively, unfit.

29. What this Court is left with though, is a decision of whether to take my child away and give her to a woman who has been declared her parent not because she gave birth to her, not because she is genetically linked in any way (*i.e.*, egg donor), and not because she adopted Isabella (because she did not), but because she alleged that she wanted me to give birth to my child and allegedly helped raise Isabella for the first sixteen months of her life. And why am I poised to lose custody of my child – because I made a mistake in my life to get involved in a sinful lifestyle. During that time, I met Janet at an AA meeting and began a rocky, unhealthy, relationship. I wanted children and made the poor choice to have a child during my relationship with Janet. I do not regret having Isabella because she is a precious gift from God. I do regret that I chose to deprive her of a father and a proper family. I am in the midst of this court battle because when I turned away from the sinful lifestyle, I wanted to end my relationship with Janet. Without the advice of counsel, I filed papers to put an official end to that relationship — which began the more than five years of litigation in this Court.

30. What I have never understood though, is how a court could create a new parentage rule/doctrine for children born as a result of assisted reproductive technology and then apply it retroactively to declare Janet a parent to my biological child who was born more than two years before the new doctrine/rule was created. Neither Janet nor I thought that was the law when we

000416

000416

entered our civil union or when we ended our relationship and yet, somehow it became "the law" after the fact. To this day, I am shocked that Janet continues to want to take my child away from me. She never really wanted her in the first place, did not adopt her, did not love her as a mother would, and has not demonstrated any real parental concern for her over the years. She is my child and I simply do not understand how a system of government that recognizes that there are certain unalienable rights that are given to us from God, and therefore cannot be taken away by government, can declare Janet a parent and give her custody or my child. The Bible is clear that I, as Isabella's parent, have the obligation to raise her according to the truth of Scripture. Our government is bound to protect my unalienable parental rights, not take them away. Yet, here we are on a motion that could result in my losing my biological child.

31.     I beg this Court not to give Janet custody of Isabella. There is simply no basis for this Court to conclude that putting Isabella's in Janet's home and lifestyle is in Isabella's best interest.

**A Few Points Made in Defendant's Motion Must Be Corrected**

32.     There are a few statements in the motion papers that I feel the need to clarify or correct. First, in the April 10, 2009 Renewal of Request for Sanctions, which I understand to be before this Court at the August 21 hearing, the motion incorrectly states that "All parties agreed" to the make-up for the missed spring break visit. I did not agree to the Easter make-up, as I stated in response to the motion for make-up that was filed after the missed Easter visit.

33.     Second, the Motion to Modify Parental Rights and Responsibilities gives the impression that Janet has repeatedly attempted to contact me since the missed visitations. On page 2 of the motion, it states that I have "not responded to attempts by Ms. Jenkins to contact her." Janet's affidavit paints a more accurate picture – Janet left me one voice mail message when the May

Miller Affidavit in Opposition - Page 18

23 visit did not occur.

34.    Third, the modification motion states that I am setting a poor example for my daughter because the visits have not occurred. As I discussed above, I believe it is Janet who is setting a very poor example for Isabella in pursuing this litigation, insisting that she is Isabella's parent, and attempting to undermine Isabella's Christian faith. In addition, it is unbelievable that Janet would accuse me of being a poor example when she has a history of abusive, controlling, and illegal behavior.

**Conclusion**

35.    I realize this case has had a long, difficult history. I know this Court does not take its decision lightly. However, I do not believe that the foundational worldview conflict has truly been considered. The decision in this case involves not just a choice of where a child will live but involves stripping a young Christian girl from her biological mother to place her in an environment that is openly hostile to the truth of Scripture. If I lose custody of my child it is because I have chosen to raise her as a Christian and she desires to live out her Christian faith. As a result, I would ask this Court to consider the words of George Washington: "It is impossible to rightly govern the world without God and the Bible" (Sept. 17, 1796), and the United States Supreme Court, which has repeatedly acknowledged that "this is a Christian nation," "we are a Christian people, and the morality the country is deeply engrafted upon

Miller Affidavit in Opposition - Page 19

000418

000418

Christianity, and not upon the doctrines or worship of those imposters." *See Church of the Holy Trinity v. United States*, 143 U.S. 457, 465, 471 (1892) and *People v. Ruggles*, 8 Johns 290 (1811).

_Lisa Miller_
Lisa Miller

## CERTIFICATE OF NOTARY

STATE OF *Virginia* :

    The forgoing Affidavit was subscribed and sworn before me this _17th_ day of August, 2009 by Lisa Miller.

_Martha L. Sneden_
Notary Public  #270093

My commission expires the _31st_ day of _October_, 20_10_.

Miller Affidavit in Opposition - Page 20

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by

mail this 17th day of August, 2009, to the following:

Sarah R. Star, Esq.
Attorney at Law
PO Box 106
Middlebury, VT 05753

Michelle Kenney, Esq.
Kenlan, Schwiebert, Facey & Goss, P.C.
P.O. Box 578
Rutland, VT 05702

Tara J. Devine, Esq.
Lorentz Lorentz & Harnett
26 Court Street
Rutland, VT 05701

_B. Lindevall_
Rena M. Lindevaldsen